Ralph Pate v. Commissioner.
Pate v. Commissioner
Docket No. 37917.
United States Tax Court
T.C. Memo 1957-59; 1957 Tax Ct. Memo LEXIS 197; 16 T.C.M. (CCH) 254; T.C.M. (RIA) 57059; March 29, 1957
*197 Respondent determined deficiencies in petitioner's income tax for the years 1942 through 1949 by a net worth computation in the total sum of approximately $18,000 (with additions thereto under section 293(b)) on approximately $50,000 unreported income. Held, petitioner had $42,500 undeposited cash on hand at the beginning of the period involved, which was not considered in the net worth computation, and therefore the net worth computation was unreliable as evidence of unreported income. Sam J. Morris, Esq., Raleigh, N.C., and M. Butler Prescott, Esq., for the petitioner. Hubert E. Kelly, Esq., and Paul J. Weiss, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions to the tax, as follows: Deficiencies
Additions
Income
to Tax
Year
Tax
Sec. 293(b)
1942
$1,835.82
$ 917.91
1943 *
2,870.72
1,435.36
1944
2,888.43
1,444.22
1945
4,105.84
2,052.92
1946
4,925.78
2,462.89
1947
289.00
144.50
1948
953.64
476.82
1949
540.56
270.28
The issues in this case are (1) whether respondent's net *198 worth computation correctly reflects petitioner's taxable net income for the calendar years 1942 through 1949; (2) whether petitioner is liable for the 50 per cent addition to the tax for any or all of the years herein involved as prescribed by section 293(b) of the Internal Revenue Code of 1939; and (3) whether petitioner is entitled to a recomputation of his tax liability for 1943 under the provisions of section 6 of the Current Tax Payment Act of 1943. Findings of Fact Some of the facts are stipulated and are so found. The petitioner, Ralph Emerson Pate, hereinafter referred to as the petitioner, is an individual now residing in New Bern, North Carolina. For the taxable years 1942 through 1949, he filed individual income tax returns with the then collector of internal revenue for the district of North Carolina. The petitioner was born October 1, 1903, in Pamlico County, North Carolina, and during the years 1942 through 1949, he resided in Bayboro, Pamlico County, North Carolina. Bayboro, a town of approximately 600 population, is the county seat of Pamlico County, which county has a population of approximately 10,000. It is a rural seacoast county and its principal industries *199 are farming and fishing. The city of New Bern, in the adjoining county, about 18 miles from Bayboro, and having a population of several thousand, was considered the "shopping city" for the residents of the Pamlico County area. The petitioner received his education in county schools. His formal education was very limited, having progressed to what would now be approximately the fifth grade. The petitioner can read and write and has operated a service station, theater, and rental properties for a number of years. During the taxable years 1942 through 1949, the only source of income petitioner had was from a service station, a theater, interest-bearing notes, an interest-bearing United States Bond, and rental properties. Some capital gain was realized from the sale of real property. The service station was located in Bayboro, North Carolina, and most of the petitioner's business was from local residents since Bayboro is not on a through highway. The service station operation was small in all of the years involved, and even smaller during the war years of gas rationing. In 1944, petitioner's brother-in-law, Abbott Morris, operated the station and split the profits with the petitioner *200 until 1947, when Morris leased the station from the petitioner. From August of 1944 until the end of 1949, petitioner never received more than $1,600 per annum from this source. The theater, known as the Pate Theater, was built in 1944 in Bayboro, North Carolina. This was also a small operation, presenting one show daily. The petitioner stopped operating the theater at the end of 1949, it being a very unprofitable business. The theater closed down completely in approximately 1950. The petitioner had notes and mortgages receivable in the years 1942 through 1949 from which he received interest income. The total of these receivables was as follows: 1942, $3,650; 1943, $2,600 1944, $2,280; 1945, $460; 1946, $1,740; 1947, $1,220; 1948, $5,100; and 1949, $9,762. The petitioner also had government bonds and investments from 1943 through 1949 from which he received interest income. The totals of these investments ranged from approximately $2,000 to approximately $12,000 over the years 1943 through 1949. The petitioner also had rental properties from which income was derived. In 1940, the petitioner constructed a frame house at a cost of approximately $3,000, which was rented through *201 1947, when the house was sold. In 1942, the rent from this house was $12 to $16 per month. Petitioner also rented space for a corner cafe and a meat market during part of the years involved. The building, in which the cafe and meat market were located, was a frame building and was vacant during part of the years involved. The petitioner also realized some gain from the sale of capital assets. In 1947, petitioner realized a capital gain of $845 from the sale of his rental house. In 1943, a gain of $350 was derived from the sale of a parcel of land. The taxable net income and income tax paid as disclosed by the petitioner on his returns for the years 1942 through 1949 are as follows: Net Income
Income
Year
Per Return
Tax Paid
1942
$1,664.09
None
1943
1,961.50 *
$105.28
1944
2,733.90
31.65
1945
2,703.70
811.54
1946
3,876.82
460.75
1947
2,078.96
524.00
1948
2,611.79
None
1949
3,158.13
92.00
When the petitioner was about four years old, his father, Warren Pate, was imprisoned in North Carolina for a criminal offense. In 1907 or 1908, the petitioner's father escaped from prison and ultimately fled to *202 Wynyard, Saskatchewan, Canada, where he settled. The petitioner's father remarried there, engaged in several successful business ventures, and lived in Wynyard until his death in 1952.
After petitioner's father escaped from prison, the petitioner did not see him again until 1929, when the petitioner was visited by his father at Fort Bragg, North Carolina. Petitioner then learned that his father was living in Canada under the alias of William Mack Potter. Thereafter, the petitioner corresponded with his father and visited him in Canada on different occasions until 1939, when the last visit to Canada was made, From time to time, petitioner's father gave or sent petitioner substantial sums of cash. The petitioner married Nancy Harris, hereinafter referred to as Nancy, in 1929, to which union a son was born in 1933. After marriage, they lived with petitioner's grandparents in Hobucken, North Carolina, where petitioner operated a small confectionery. Subsequent to this, he operated a service station for R. J. Flowers in Grantsboro, North Carolina. Hobucken and Grantsboro are in very close proximity to Bayboro and are even smaller than Bayboro. Around 1932, the petitioner began operating *203 a service station in Bayboro on his own account. In 1935, petitioner purchased a parcel of land in Bayboro for $500, and had a service station constructed thereon for $1,500. The equipment for the station was purchased in 1935 and 1936 at a cost of $2,200. From time to time there were three other stations in Bayboro. Each of the three other stations was closed at one time or another during the years involved because of a lack of business. The petitioner kept a small safe in his service station and in the fall of 1937 the station was burglarized, but the safe could not be opened. Upon investigation of the burglary by the sheriff of Pamlico County, the safe was opened and a substantial sum of money was found. The sheriff did not count the money but advised the petitioner to put it in the bank. The petitioner then went to the branch Bank of Aurora, located in Bayboro, where he left an envelope containing $18,000 with the cashier. The money was not deposited but kept in the bank's main safe for the petitioner. Between the fall of 1937 and 1941, the petitioner withdrew all of the $18,000 in approximately six withdrawals. In April 1937, the petitioner purchased a parcel of land in Bayboro *204 for $750 and had constructed his personal residence thereon at a cost of $3,500. This residence was in close proximity to his service station and petitioner and his family resided there from 1937 through 1949. From 1942 through 1944, Nancy assisted the petitioner at the service station. The petitioner also employed an attendant from time to time. Nancy, and the petitioner to a lesser degree, prepared checks for payment of business expenses and made bank deposits. From August 1944 to 1947, the service station was operated by Abbott Morris for the petitioner on a 50-50 split profit basis. From 1947 through 1949, Morris leased the service station from the petitioner. After the theater was constructed, it was open for one movie showing per day. Nancy assisted in the box office of the theater and by writing checks and making bank deposits for the theater. A boy was employed to operate a popcorn machine. Subsequent to 1949, the petitioner stopped operating the Pate Theater because of poor business. During the years 1942 through 1949, the petitioner did not maintain proper books of account from which his taxable net income could be computed. During the years 1942 through 1949, the *205 petitioner did not maintain any record of undeposited cash on hand. Petitioner did file intangible personal property returns with the North Carolina Department of Revenue for the years 1941 through 1947. None were filed for 1948 or 1949. These returns were sworn and subscribed to by petitioner. In these returns he reported that he had undeposited cash on hand at the end of each of the years 1941 through 1947 in the following amount: Undeposited Cash
on Hand Per
Year
Intangible Return
1941 $250
1942
400
1943
600
1944
300
1945
349
1946
415
1947
390
The respondent gave petitioner credit for the above cash on hand in his net worth computation. As no returns were filed in 1948 and 1949, the respondent gave petitioner credit for no cash on hand for those years. In addition to undeposited cash on hand as thus reported by petitioner in 1947, the respondent gave petitioner credit for $4,000 cash which he received on the sale of his frame house that year. The respondent determined that the petitioner had a liability in the form of a loan payable to his father at the end of 1941 in the amount of $18,000. The respondent further determined that this liability *206 remained constant through 1946 but decreased in the amount of $3,500, $2,000, and $1,000 during 1947, 1948, and 1949, respectively. Being unable to compute petitioner's income from the records made available, respondent proceeded to reconstruct petitioner's taxable net income for the years 1942 through 1949 by the net worth plus personal expenditures method. During the years 1942 through 1949, the petitioner made expenditures for nondeductible and personal living expenses in amounts as follows: Year
Amount
1942
$2,500.00
1943
4,311.91
1944
2,500.00
1945
3,500.00
1946
4,000.00
1947
4,250.00
1948
4,250.00
1949
4,250.00
The examination of petitioner started in May 1950 and was completed in January 1951. On the first interview, the petitioner furnished respondent's agents the names of several banks in which he had done business. He also told the interviewers that he had made several loans to friends around Bayboro. The petitioner was cooperative with the agents on the initial interview concerning everything but information which could be verified by the agents as to cash received from his father. During the examination the petitioner did not make *207 any contention or earmark any undeposited cash on hand as being on hand at the end of any of the years under investigation. Affidavits were produced to the effect that petitioner had cash in large amounts from 1937 through 1940 at about the time the investigation was completed. The following table shows the reported net income of the petitioner, the net income of petitioner according to the respondent's net worth computation, revised somewhat by concession of respondent on brief, and the unreported income of petitioner according to the revised net worth computation: Correct Net
Unreported Net
Reported
Income Per
Income Per
Net Income
Net Worth
Net Worth
Year
Per Return
Computation
Computation
1942
$ 1,664.09
$ 8,812.18
$ 7,148.09
1943
1,961.50 *
11,789.56
9,828.06
1944
2,733.90
9,320.80
6,586.90
1945
2,703.70
14,151.28
11,447.58
1946
3,876.82
17,695.85
13,819.03
1947
2,078.96
2,950.16
871.20
1948
2,611.79
6,406.75
3,794.96
1949
3,158.13
5,086.33
1,928.20
Totals
$20,788.89
$76,212.91
$55,424.02
Petitioner's increase in net worth from 1941 through 1949 was $46,236.89. The *208 petitioner had $42,500 undeposited cash on hand on December 31, 1941, for which he was not given credit in respondent's net worth computation. The petitioner had no loans payable at the end of each of the years 1941 through 1949. The net worth computation introduced by the respondent is unreliable and cannot be employed in this case. Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioner's income taxes for the years 1942 through 1949 by use of the net worth and expenditures method. This computation indicates increases in net worth over the years in question in a total sum of approximately $45,000. Of course, the inference is that an increase in net worth, standing alone, is attributable to currently taxable income. Holland v. United States, 348 U.S. 121. Such increase in net worth, after making appropriate adjustments for such items as the nontaxable portions of capital gain, gifts, inheritances, living expenses, and Federal income taxes paid, may be taken as evidence of a taxpayer's net income for that year. Where the increase in net worth is substantially greater than the income reported by the taxpayer, the net worth computation is evidence *209 of unreported income. Michael Potson, 22 T.C. 912. The petitioner contends that the increases in net worth, as shown by respondent's computation, are not attributable to currently taxable income but to $42,500 undeposited cash which he had on hand December 31, 1941, for which the Commissioner gave him no credit. If the increase in taxpayer's net worth was not actually attributable to unreported income, it is incumbent upon him to establish that fact by "competent and satisfactory evidence." Carmack v. Commissioner, 183 Fed. (2d) 1 The cash hoard story is a favorite defense in net worth cases but it is seldom that such a story is supported by credible corroborating evidence to render it capable of belief. Here we believe we have a story which is corroborated and capable of belief. Petitioner's story about the cash hoard is as follows: About 1907 his father escaped from a North Carolina prison, where he was serving time for a criminal offense, and fled to Canada. There he settled in Wynyard, Saskatchewan, and engaged in several successful business ventures. Petitioner was in the Army in 1929 and his father came to see him in February of that year at Fort *210 Bragg. For the first time, petitioner learned that his father had been living in Canada over the intervening years, under the name of William Mack Potter. Petitioner secured a leave of absence and he and his father went to Fayetteville, North Carolina, where they stayed overnight and he and his father discussed various businesses which petitioner could enter and his future in general. At this time the father gave petitioner $3,500 in United States currency. Shortly after this meeting, petitioner got out of the Army and married Nancy. The petitioner saw his father again in March of 1929 when he and his father met at the home of D. C. Foster, in Gastonia, North Carolina. Foster's wife was a sister of the petitioner's father. After a short visit, his father returned to Canada and petitioner returned to Bayboro. It was petitioner's story that on this visit his father made arrangement to forward money to petitioner's uncle, D. C. Foster, for the petitioner and that he did so, and that shortly thereafter, in response to a letter from Foster, he returned to Gastonia and Foster gave him $10,000 in United States currency that his father had sent. Petitioner related, in much detail, three *211 trips made by automobile, to visit his father in 1935, 1936 and 1939. On the first trip he stayed at his father's home. His father had married and had had children but he was introduced to the Canadian family as a "friend." On this visit, his father gave him $10,000, a part of which was in Canadian currency, and a part in United States currency. Nancy accompanied him on the second trip when they again stayed at his father's home and on this trip his father gave him $20,000 in United States and Canadian currency. On the 1939 trip the father had arranged to meet him in Regina, Saskatchewan, because his wife had noted petitioner and his father favored each other in looks. On this trip to Regina his father gave him $5,000, most of which was in United States currency. Petitioner testified his father died in February 1952. When petitioner was first interviewed by the revenue agents on May 2, 1950, he was placed under oath and interrogated concerning his financial affairs. He told the agents that, from 1936 to 1940, he had from $35,000 to $40,000 cash on hand. He told the agents that he had received this cash from his father; that his father had been in difficulty and had gone to Canada; *212 that he had visited his father on different occasions and his father had given him money; and that he did not want to disclose the whereabouts of his father in Canada as he did not want him brought back and punished. At the trial petitioner testified he had $42,500 cash of the money his father had given him on December 31, 1941. We turn now to the corroborating evidence of the cash hoard story. To begin with, the story is corroborated by Nancy. We will not detail her evidence for, of course, it cannot be said she was without interest. In the main, it followed petitioner's story and at times she handled part of the cash and she corroborated petitioner about his hiding places for the cash in the sand trap in the filling station and various safes. In 1937 Sheriff Wharton investigated a break-in of petitioner's filling station in Bayboro. The cash register money was taken in the robbery and evidently an unsuccessful attempt had been made to open a small safe by knocking off the hinges. The petitioner opened up the safe for the sheriff and the sheriff testified: "I saw a good big amount of money." He said he did not count it but saw the denominations - "some hundreds * * * some fifties *213 and twenties." He remonstrated with petitioner about keeping so much cash and told him he should bank it and he remarked, "Ralph, you must have 10 or 12 thousand dollars here", to which petitioner replied: "There is about twice that much." Carl Allcock, an uncle of petitioner, but evidently about the same age, testified of seeing petitioner with large rolls of bills on occasions in 1929 and 1930. He knew of his later trips to Canada and petitioner told him the trips were to get money from his father. He knew that petitioner, on occasions, kept money in his father's (petitioner's grandfather's) safe in his home. Wallace Hooker, who worked for petitioner in the filling station from about 1935 to 1940, knew of petitioner's trips to Canada and petitioner told him he went to Canada to get money. He said the filling station did very little business but petitioner always "had right smart of money." He saw the money but he did not count it. Petitioner told him he got the money in Canada and some of the money was Canadian money and "the exchange onto it was not as much as he thought it was going to be." J. G. Rutledge, the banker at Aurora, testified petitioner came to him in 1937 to *214 rent a lock box in which to put money. He told the petitioner the lock boxes were not insured and not safe and would be glad to put petitioner's currency in an envelope in a compartment of the bank's safe. He testified petitioner brought in $18,000 in hundred dollar bills and he put it in an envelope in the bank's safe. He said petitioner withdrew the money in five to seven withdrawals. He could not remember the dates of the withdrawals but he thought the money had all been withdrawn by petitioner within four years. Georgia Lee, a superintendent for a life insurance company in New Bern who had known petitioner all of his life, dropped by his filling station in December 1940. He testified petitioner was in the back room counting money. He said petitioner was having trouble reaching the same figure in his count and he helped him and he counted $35,000 in hundred dollar bills and there was other money which he did not count which he described as being "a bunch of different-sized bills; there were some fifties, twenties, and what have you." G. F. Harris, a former coroner and the operator of a mercantile business in Bayboro, testified he bought the property where he has his store and *215 where he lives from petitioner. He bought this property in 1940 for $1,550, and petitioner loaned him $500. He said that about this time he had a discussion with petitioner about a business corner in New Bern on which were located four or five small wooden store buildings. He knew the owner of this property and he said petitioner asked him to find out if the owner would sell, saying he would pay $40,000 for the property. He went to see the owner for petitioner. This property was later sold to J. C. Penney. We realize respondent has great difficulty in refuting a cash hoard story. But usually the taxpayer, too, encounters much difficulty in furnishing corroboration of his story. If there be a cash hoard, the keeper is usually somewhat secretive about it. Here there is much evidence of a cash hoard in some amount by disinterested witnesses that supports petitioner's story. In fact, respondent admits petitioner had $18,000 in cash in 1937 and that he received this from his father. But respondent argues the record does not show he had it on hand December 31, 1941. That is true but other witnesses, such as Georgia Lee, who apparently had no interest in the case, saw this much and more *216 in December of 1940. The banker, Rutledge, and the insurance man, Lee, were both lifelong friends of petitioner. Rutledge, who received the $18,000 in currency, and Lee were both testifying wholly from memory. The respondent accepts Rutledge's testimony in toto but rejects the testimony of Lee. They both gave forthright testimony and we believe the testimony of both. The testimony of Lee was rendered even more credible in the light of the testimony of Harris. Harris testified that in the same year (1940) that Lee counted and saw over $35,000 in petitioner's possession, he, Harris, was attempting to negotiate a $40,000 cash purchase of business property for petitioner. The story of the petitioner is rendered more credible by the entire lack of any evidence from which we could even infer a possible source of large income during the years in question. A careful search of the record reveals no evidence of any likely source from which the petitioner could have derived the substantial income attributed to him. It could not have come from the small filling station operation which was located on a local road and not even near a through highway. The area is wholly rural and completely cut *217 off from any tourist trade. Also during some of the years there was gasoline rationing and the record shows that the petitioner never received more than $1,600 a year from his filling station in the years 1944 through 1949. The substantial income attributed to the petitioner by respondent could never have been derived from the Pate Theater built in 1944, and closed in 1949 as a very unprofitable venture. Nor could it have come from the very small rental and interest income which petitioner received during most of the years involved. We do not mean to say that evidence of a likely source from which the taxpayer could have derived the currently taxable income attributed to him by the net worth computation is an indispensible requirement in a routine case of deficiency as is indicated by Thomas v. Commissioner, 232 Fed. (2d) 520, reversing a Memorandum Opinion of this Court [14 TCM 156; T.C. Memo. 1955-46]. What we do say is that it is a circumstance to be considered. When the Government rests its case solely on the inferences of net worth computations and the record presents no evidence of a likely source of such currently taxable income, *218 then the cash hoard story, initially asserted and consistently maintained, gains additional cogency. All of petitioner's witnesses, most of whom had known him all of his life, testified as to petitioner's good reputation in the community. Petitioner's witnesses included substantial citizens in the community, such as the sheriff, a merchant and former coroner, a banker, and an insurance superintendent. The petitioner is uneducated and, while he answered questions haltingly, he did not appear evasive. It is true that he did not cooperate with respondent's agents when interviewed to the exent of telling where his father lived in Canada. While this is not to be condoned, it is understandable that he would fear that such disclosure would result in punishment for his father. In addition to respondent's error as to cash on hand in the opening year of the net worth computation, another, but less serious, error was made in loans payable computation. As we have stated, the respondent conceded that petitioner received $18,000 from his father but contended that it represented a loan. The respondent therefore determined that the petitioner had a liability in the form of a loan payable at the *219 end of 1941 in the amount of $18,000. This liability remained constant in amount through 1946, according to the respondent, but decreased in the amount of $3,500, $2,000, and $1,000 during 1947, 1948, and 1949, respectively, the ending balance in 1949 being $11,500. The respondent bases his argument solely on an interview with the petitioner on January 1, 1951. At this interview the revenue agents testified that the petitioner told them that all the money he received from his father was received as a loan and that he paid part of the loan in 1947, 1948, and 1949. Petitioner denied making the statement and testified that the money was given to him by his father. To substantiate his claim that none of the money received from his father was a loan, the petitioner introduced a letter, identified as being from his father, which indicated that the money was given to the petitioner with an implied conditional promise to come to his father's financial aid if and when needed. Petitioner's testimony was to the same effect. Certainly the donee of such a "conditional gift" could not be said to be a debtor of the donor. Considering all of the evidence, we hold that the petitioner had no loans *220 payable to his father in the years 1942 through 1949. We have found two errors in respondent's net worth computation. These errors, we believe, cast grave doubts upon the reliability of the computation as evidence of unreported income. The recent decisions of the Supreme Court, Smith v. United States, 348 U.S. 147; Holland v. United States, 348 U.S. 121; United States v. Calderon, 348 U.S. 160; and Friedberg v. United States, 348 U.S. 142, contain extended discussions of the care which must attend the use of the net worth method in the tax cases. It was stated in the Holland case, supra, in discussing the evolution of the net worth method: "The net worth method, it seems, has evolved from the final volley to the first shot in the Government's battle for revenue, and its use in the ordinary incomebracket cases greatly increases the chances for error." * * *
Further: "While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. * * * Trial courts should approach these cases in the full realization that the taxpayer may be ensnared *221 in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute." * * *
Further: "We agree with petitioners that an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * *" While the cases just cited are criminal cases, we think that the guideposts contained therein have equal application to all cases in which the net worth method is employed. "Despite the essential difference between the burden of proof in a criminal case and that in a Tax Court deficiency determination, we see no reason why the determination of opening net worth should be any less vital to the validity of the method of computation invoked in the one type of case than in the other." Thomas v. Commissioner, 223 Fed. (2d) 83. We feel that the admonitions of the Supreme Court just recited can well be applied *222 to the instant case. We have stated many times in the past that "where the employment of the net worth method reveals a substantial gap between reported income and the increase in net worth, the latter may be taken as a guide for determining the amount of income actually received." [Italics supplied.] Estate of George L. Cury, 23 T.C. 305. See also Michael Potson, supra.Do we have such a substantial gap in the instant case? The gap between petitioner's reported net income of $20,788.89, and the respondent's total increase in net worth per the net worth computation of $46,236.89, was approximately $26,000. Certainly this is a substantial gap and left unexplained, the computation would be a reliable "guide for determining the amount of income actually received." Here, however, the petitioner's cash story more than explains the difference in the above figures. The gap between petitioner's net income as reported of $20,788.89 and the petitioner's net income per respondent's net worth computation of $76,212.91, amounted to approximately $55,000. The petitioner's cash story, plus our determination that the petitioner had no loans payable over the years in *223 question, reduce this substantial gap to approximately $6,000. Considering the number of years involved and also considering that a net worth computation is an approximation, we do not feel that we have a substantial gap between reported net income and the net worth computed net income. Believing, as we do, that the petitioner had $42,500 undeposited cash on December 31, 1941, which the respondent did not include in petitioner's opening net worth computation, and considering all the other evidence of record, we believe the net worth computations made in this case by the Commissioner to be unreliable. Our holding above rendered discussion on the issues of fraud and recomputation of petitioner's tax liability for 1943 unnecessary. Decision will be entered for the petitioner. Footnotes
*. Income and Victory tax.↩
*. Income and Victory tax.↩
*. Income and Victory tax.↩